IN THE SUPREME COURT OF THE STATE OF KANSAS

Nos. 126,718
126,719

In the Interest of K.W.D. and E.L.D.,
Minor Children.

SYLLABUS BY THE COURT

1.

A natural parent who has assumed parental responsibilities has a fundamental constitutional right to a parental relationship with his or her child protected by the Kansas and United States Constitutions.

2.

When a child has been adjudicated to be a child in need of care, the court may terminate parental rights or appoint a permanent custodian when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future.

3.

To determine whether a parent is unfit by reason of conduct or condition which renders them unable to care properly for a child, K.S.A. 38-2269(b) requires the district court to consider a nonexclusive list of statutory factors, as applicable. When a child is not in the parent's physical custody, K.S.A. 38-2269(c) requires the district court to consider a separate list of nonexclusive factors. Under K.S.A. 38-2269(f), any one factor may—but does not necessarily—establish grounds for termination of parental rights.

1

4.

When reviewing findings of parental unfitness, appellate courts view all the evidence in a light most favorable to the State and decide whether a rational fact-finder could have found it highly probable—i.e., by clear and convincing evidence—that the parent was unfit. In making this decision, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact.

5.

Conviction of a felony and imprisonment is an independent statutory condition of unfitness so long as it renders the parent unable to care properly for their child.

6.

Courts examine the "foreseeable future" from the child's perspective because children and adults have different perceptions of time; a month or a year can seem considerably longer for a child than for an adult. Children have a right to permanency within a time frame reasonable to them.

7.

In assessing whether the conduct or condition rendering the parent unable to care properly for the child is unlikely to change in the foreseeable future, the inquiry does not end merely because the underlying condition—such as imprisonment—has a defined endpoint. The critical question under Kansas law is not just whether the parent will be physically available, but whether the parent will be able to care properly for the child in a time frame consistent with the child's best interests.

8.

If the court makes a finding of unfitness, the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child. In making the determination, the court shall give primary consideration to the physical, mental, and emotional health of the child. If the physical, mental, or emotional needs of the child would best be served by termination of parental rights, the court shall so order.

Review of the judgment of the Court of Appeals in an unpublished opinion filed September 27, 2024. Appeal from Leavenworth District Court; JOAN M. LOWDON, judge. Oral argument held May 12, 2025. Opinion filed August 8, 2025. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Jennifer Martin Smith*, of Alderson, Alderson, Conklin, Crow & Slinkard, L.L.C., of Topeka, argued the cause and was on the briefs for appellant.

*Sarah Ikena*, assistant county attorney, argued the cause, and *Ashley Hutton*, assistant county attorney, and *Todd Thompson*, county attorney, were on the brief for appellee.

The opinion of the court was delivered by

STANDRIDGE, J.: The Father of two minor children, K.D. and E.D., appeals the termination of his parental rights. The district court placed the children into State custody and adjudicated them as children in need of care because Father was convicted of a felony and imprisoned and Mother was unable to care for them because of a drug addiction. After 16 months without progress towards reintegration, the district court found both parents unfit by conduct or condition unlikely to change in the foreseeable future and terminated their parental rights. Father appealed, alleging the district court improperly terminated his rights based on his imprisonment alone. The Court of Appeals

3

panel affirmed the district court's ruling. We granted Father's expedited petition for review.

In his Petition for Review, Father asks this court to consider whether the panel erred in affirming the district court's unfitness and foreseeability findings and ultimate termination decision. After reviewing the entire record and considering the evidence in the light most favorable to the State, we agree with the panel in concluding there is clear and convincing evidence to support the district court's finding that Father is unfit by reason of conduct or condition—conviction of a felony and imprisonment—which renders him unable to care properly for his children and the conduct or condition rendering him unable to care properly for his children is unlikely to change in the foreseeable future. We also agree with the panel that the district court did not abuse its discretion in holding termination of Father's parental rights was in the children's best interests. Thus, we affirm the decisions of the district court and the panel.

FACTS

Father is the natural and legal father of the two minor children represented in this case, K.D. and E.D., born in 2017 and 2018 respectively. The Kansas Department for Children and Families (DCF) first became involved with this family in 2015, after receiving reports of Mother's drug use and lack of supervision, physical neglect, and abuse of an older child in the home. In 2018 and 2019, DCF received two such reports pertaining specifically to K.D. and E.D., though the case file states the reports were "unsubstantiated" at the time. In January 2020, Father began serving a five-year sentence for felony convictions of attempted aggravated robbery and domestic violence.

In June 2021, DCF received a report that Mother was high on methamphetamine and had left K.D. and E.D. in the care of their paternal grandmother for months without

4

providing care or checking on them. DCF ultimately deemed paternal grandmother to be an unsuitable placement for the children due to credible allegations of physical abuse by the grandmother. DCF and Mother created a safety plan for the children, which specified that the children would reside with their maternal grandmother in Virginia while Mother completed drug treatment. But Mother did not comply with this plan and refused to tell DCF where the children were located. Thus, DCF filed for protective custody and initiated a child in need of care (CINC) action.

On July 28, 2021, K.D. and E.D. were placed into the temporary custody of DCF via ex parte order by the Leavenworth County District Court. According to the order, Father was incarcerated, and Mother was homeless and unable to care for the children due to a drug addiction. The State filed a petition that same day alleging K.D. and E.D. were children in need of care.

On August 2, 2021, the Cornerstones of Care case manager met with Father at the Initial Service Plan meeting to develop the initial reintegration case plan. The following goals were established at that meeting and applied to both parents:

- attend an age-appropriate parenting class and provide certificate of completion to Cornerstones of Care;

- attend co-parenting class and provide certificate of completion to Cornerstones of Care;

- attend domestic violence class, provide certificate of completion, and sign release of information to Cornerstones of Care;

- get mental health assessment and follow recommendations, provide proof of assessment, and sign release of information to Cornerstones of Care;

- get drug and alcohol assessment and follow recommendations, provide proof of assessment, and sign release of information to Cornerstones of Care;

- submit to random urinalyses (UAs) as requested by Cornerstones of Care or DCF; and

- resolve all legal issues and provide proof to Cornerstones of Care.

On October 6, 2021, Father filed a no-contest statement with the district court in response to the allegations set forth in the CINC petition. On October 12, 2021, the court formally adjudicated K.D. and E.D. to be children in need of care based on K.S.A. 38-2202(d)(1) (without parental care, control, or subsistence not due solely to parents' lack of financial means), (d)(2) (without care or control necessary for child's physical, mental, or emotional health), and (d)(3) (presence of abuse or neglect). The court ordered Father to have telephone contact with his children while incarcerated, to be arranged by Cornerstones of Care, in conjunction with the corrections facility.

After their removal by DCF, K.D. and E.D. were placed together with an older half-sibling in foster care. The children were at this initial placement when the district court held its first permanency hearing on March 29, 2022, and found that reintegration continued to be a viable goal.

But at the next hearing about five months later on July 12, 2022, the court determined reintegration was no longer viable. That month, the children transitioned to a second foster home after being removed from the first due to significant behavioral issues. The children were having no contact with their parents at that point: no visitation had occurred with Mother because the initial criteria of submitting negative UAs had not been met, and phone calls with Father in prison were no longer taking place due to scheduling conflicts. At the hearing, the court directed the State to file a petition to

6

terminate parental rights or establish permanent custodianship. The court also ordered an expedited Interstate Compact on the Placement of Children (ICPC) home study of the maternal grandmother in Virginia.

On August 29, 2022, the State moved to terminate parental rights. On November 16, 2022, the district court heard testimony on the State's termination motion. K.D. and E.D. were five and four years old at the time.

Father testified that he had been incarcerated since January 2020 and was serving a five-year felony sentence for attempted aggravated robbery and domestic violence. His earliest possible release date was December 24, 2023, with computation of "good time"; otherwise, he would be released in April 2024. Father admitted he had previously served time in prison from 2010 to 2013 for aggravated robbery and criminal discharge of a firearm at an occupied dwelling.

Father received copies of the reintegration plan while incarcerated. In his view, he had done as much as possible to comply with the plan given the limitations of his environment. Father said he asked to take a mental health assessment but was told he did not meet the criteria for behavioral health. He did not complete a drug and alcohol assessment but said he had never struggled with substance abuse; also, his understanding was that Cornerstones of Care would need to coordinate with his prison unit team for him to complete UAs, which had not happened. Father noted that he recently inquired about an "improving family relations" class but was still waiting to hear back. He completed a domestic violence class before the children were taken into custody but not since.

Father had some contact with his children between July 2021 and April 2022: he saw them once on a video call and had telephone calls with them five or six times. Father had no contact with his children after April 2022, mainly because his work shift changed

and scheduling became too difficult due to Father's unavailability, the prison phone hours were restricted, and the children's availability for phone call visits was limited. Specifically, Father was only able to make or receive calls from 2:00-4:30 p.m. on weekdays (no weekend prison phone use available), and the children were in school, daycare, therapy, or extracurricular activities during that time.

Despite this limited contact with the children while incarcerated, Father said he had a bond with his children, he loved them, and he wanted to do things for them. He would have liked more contact, such as through phone or video calls, but could not get these set up. He did not have the address of the foster placement to send letters and had difficulty getting in touch with the case manager, who he said rarely answered his calls or emails. He claimed he recently started sending money to his mother (paternal grandmother) to put into an account for the children. He said he was motivated not to get any write-ups in prison so he could be released early for his children's sake. Father said his postrelease plan was to live with his mother in Leavenworth while on parole, at least initially.

Father testified that he had been in a relationship with Mother since 2015 and that they lived together before his imprisonment. When asked about Mother's drug use, which prompted the children's removal, Father responded "we all make mistakes." He agreed with counsel's statement that Mother had stayed off drugs when they were together and thus he had no knowledge of what the circumstances were like when she was using drugs. He characterized her as "a very good mother," confirmed that she took care of the children, and expressed his belief that she could get clean and follow a treatment plan at some point in the future.

Abigail Wieberg, the Cornerstones of Care foster care case manager, also testified. She was assigned to this case in July 2021. She noted the baseline concerns at the time

were related to Mother's drug use and reports of physical abuse by the paternal grandmother. Wieberg testified that she created reintegration plans for both parents and provided them with copies of the plans. Most of Wieberg's direct interactions were with Mother through text messages and tracking her progress (or lack thereof) with plan tasks. Wieberg interacted with Father indirectly through his attorney or prison unit team leader. She estimated these contacts took place roughly on a monthly basis, usually before court dates.

Wieberg testified that both children were exhibiting current signs of emotional distress and developmental problems. K.D. was receiving services through the Severely Emotionally Disturbed waiver, and E.D. was struggling with enuresis and encopresis (problems with bathroom training) that his therapist attributed to trauma. Wieberg stated that the children were receiving therapy services.

Wieberg characterized Mother as substantially noncompliant with the reintegration plan. As for Father, Wieberg agreed his compliance was limited due to his imprisonment but felt there were still tasks he could have completed and did not. For example, she believed parenting classes are offered in prisons, but Father had not taken one. She was not sure whether mental health assessments were available. She explained the difficulties in coordinating phone visits with Father and the children due to Father's work schedule; limited prison phone time; and the children's school, therapy services, and extra-curricular activities. Wieberg said she was unaware of the parents providing any financial support to the children during this case.

Given the lack of progress in the case over 16 months, Wieberg did not believe reintegration was possible in the near future. She said the children's maternal grandmother in Virginia was a potential adoptive resource and that an ICPC assessment was ongoing to determine whether the children could be placed with this out-of-state

9

relative.

At the close of evidence, the district court took the matter under advisement. On December 7, 2022, the district court issued an oral ruling terminating parental rights finding both parents unfit by conduct or condition unlikely to change in the foreseeable future and concluding termination was in the children's best interests. As to Father specifically, the court found him unfit under K.S.A. 38-2269(b)(5) (conviction of a felony and imprisonment), (b)(7) (failure of reasonable efforts by agencies to rehabilitate family), and (c)(3) (failure to carry out a reasonable reintegration plan). The court noted Father's felony convictions and term of imprisonment limited his ability to work towards reintegration. Yet the court also found Father could have done more and referenced his late inquiry about a parenting class as an example. For these reasons, the court found Father unfit to care properly for K.D. and E.D.

Over six months later, in June 2023, the district court electronically filed the written termination order, which was prepared and submitted by the Leavenworth County assistant county attorney and signed by counsel for all parties. Although the written termination order is consistent with the court's oral pronouncement to the extent that it finds Father unfit under K.S.A. 38-2269(b)(5), (b)(7), and (c)(3), the written order also inexplicably finds Father (along with Mother) unfit under K.S.A. 38-2269(b)(3) (use of alcohol or drugs) and (b)(4) (abuse or neglect).

No evidence was presented at the termination hearing to support these factors as to Father, and the court did not consider these factors with respect to him; the court *only* considered these factors relevant to Mother's unfitness, as made clear by the transcript of the hearing. Yet Father did not object to the written termination order. As noted, Father's counsel affirmatively approved and signed it. Neither of the parties raised this issue on appeal, and the panel did not address it. See *In re K.D. and E.D.*, No. 126,718, 2024 WL

4314687, *2-3 (Kan. App. 2024) (unpublished opinion) (discussing basis for district court's unfitness findings as to Father only under subsections [b][5], [b][7], and [c][3]). And Father did not raise this issue in his Petition for Review.

Given the discrepancy was not raised by the parties or noted in the panel's opinion and the written termination order is consistent with the court's oral pronouncement to the extent that it finds Father unfit under K.S.A. 38-2269(b)(5), (b)(7), and (c)(3), we will ignore the discrepancy between the written and oral termination orders and limit our review to the issues raised by the parties and considered by the panel.

In finding Father unfit by reason of conduct or condition which rendered him unable to care properly for his children and that the conduct or condition is unlikely to change in the foreseeable future, the district court considered Father's past criminal history for similar serious offenses and the lack of evidence that he was "doing well" out in the community before this case. The court also found Father's postrelease plan to live with his mother while on parole weighed heavily against him due to substantiated reports of physical abuse by his mother that, in part, prompted the children to be placed into DCF custody.

Finally, the district court determined that termination of parental rights was in the children's best interests due to their need for permanency. The court considered the behavioral issues exhibited by the children while in foster care, which seemed to worsen when they transitioned from one foster placement to another. Given the potential permanency option that would keep K.D. and E.D. together with their older sibling in the maternal grandmother's home, the court held that termination of parental rights was in their best interests.

11

A Court of Appeals panel affirmed. It concluded the district court did not err in viewing Father's imprisonment as an unfitness factor under K.S.A. 38-2269(b)(5) due to the negative impact it had on the children in this case. The panel avoided delving into the court's factual findings under (b)(7) and (c)(3) but indicated the supporting evidence was weak for these factors. The panel also agreed with the district court that Father's unfitness was unlikely to change in the foreseeable future due to continuing obstacles to reintegration that stretched out indefinitely. Finally, the panel concluded the district court did not abuse its discretion in holding termination was in the children's best interests because it gave the children a chance to have permanency with a relative rather than waiting on Father, who lacked any such plan. *In re K.D.*, 2024 WL 4314687, at *4-5.

ANALYSIS

On review, we consider (1) whether the panel erred in holding clear and convincing evidence supported the district court's unfitness and foreseeability findings and (2) whether the panel erred in holding the district court did not abuse its discretion in ruling termination was in the children's best interests.

1. *Unfitness*

A natural parent who has assumed parental responsibilities has a fundamental constitutional right to a parental relationship with his or her child protected by the Kansas and United States Constitutions. *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). The State may extinguish the legal bond between a parent and a child only upon clear and convincing proof of parental unfitness. *Santosky v. Kramer*, 455 U.S. 745, 753-54, 769, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 705-06, 187 P.3d 594 (2008).

12

Accordingly, once a child has been adjudicated to be a child in need of care, the district court may terminate parental rights only if it "finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). The plain language of the statute establishes a two-part test that must be met for the district court, in its discretion, to terminate parental rights. First, the court must find clear and convincing evidence that a parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child. If the court makes such a finding, the court then must find clear and convincing evidence that the conduct or condition rendering the parent unable to care properly for a child is unlikely to change in the foreseeable future.

When reviewing a district court's unfitness and foreseeability determinations, the appellate court considers whether, after review of the entire record, viewing all evidence in the light most favorable to the State, a rational fact-finder could have found the determination highly probable—i.e., by clear and convincing evidence. See *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4, 705-06. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

A. *Conduct or condition which renders the parent unable to care properly for a child*

To determine whether a parent is unfit by reason of conduct or condition which renders the parent unable to properly care for a child, the statute requires the district court to consider a nonexclusive list of statutory factors, as applicable. K.S.A. 38-2269(b). When a child is not in the parent's physical custody, the court must also consider a

13

separate list of nonexclusive factors. K.S.A. 38-2269(c). Any one factor may—but does not necessarily—establish grounds for termination of parental rights. K.S.A. 38-2269(f).

In its oral ruling, the district court found Father unfit based on the following conduct and conditions which rendered him unable to care properly for his children:

- K.S.A. 38-2269(b)(5) (conviction of a felony and imprisonment);
- K.S.A. 38-2269(b)(7) (failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family); and
- K.S.A. 38-2269(c)(3) (failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home).

The court also determined that the conduct and conditions rendering Father unable to care properly for his children were unlikely to change in the foreseeable future and that termination was in the best interests of the children. The court repeated these findings and conclusions in the written journal entry.

On appeal, the panel agreed with the district court's findings, focusing primarily on Father's imprisonment under K.S.A. 38-2269(b)(5) and its negative effect on the children and reintegration. *In re K.D.*, 2024 WL 4314687, at *4. While the panel recited the district court's reliance on (b)(7) and (c)(3) and discussed Father's limited efforts to comply with the case plan, the panel did not independently analyze or expressly adopt those provisions as legal grounds for terminating Father's parental rights.

On review, Father challenges all three of the district court's oral unfitness findings but his arguments focus primarily on K.S.A. 38-2269(b)(7) and (c)(3). Specifically, he claims that the reintegration plan was unreasonable given the constraints of his imprisonment and that the agencies did not make reasonable efforts to help him

14

accomplish the tasks set forth in the plan. But even if we are persuaded by Father's arguments regarding these statutory factors, K.S.A. 38-2269(b)(5) provides that conviction of a felony and imprisonment is an independent statutory condition of unfitness so long as it renders the parent unable to care properly for their child. And the record here contains clear and convincing evidence to support the district court's finding that Father's felony conviction and resulting imprisonment rendered him unable to care properly for his children.

Notably, our conclusion is based on the facts here and should not be construed to mean that imprisonment, in and of itself, will always render a parent unable to care properly for a child in every case. Although imprisonment limits a parent's physical presence, it does not extinguish the ability to parent. Although perhaps rare, a parent may fulfill the core elements of parental care—bonding, decision-making, emotional support, and provision for the child's needs—through alternative means. For example, when a parent arranges for a stable caregiver, sends financial support, maintains regular and meaningful communication, and remains engaged in the child's life decisions, imprisonment alone may be insufficient to establish that the parent is unable to care properly for their children under K.S.A. 38-2269(b)(5). See, e.g., *In re T.H.*, 60 Kan. App. 2d 536, 494 P.3d 851 (2021) (reversing termination where father maintained weekly contact with child, designated a trusted caregiver, sent financial support, and completed all reintegration tasks available in prison).

But those are not the facts here. At the time the district court terminated Father's parental rights, Father had failed to fulfill any of the core elements of parental care— bonding, decision-making, emotional support, and provision for the children's needs— through any alternative means. And the record shows his children were suffering as a result. K.D. and E.D. struggled with significant behavioral and emotional problems, required therapy services and other interventions, and had to adjust to changing foster

15

placements due to these challenges. These facts clearly and convincingly support the district court's finding that Father was unfit based on his felony conviction and imprisonment, which rendered him unable to care properly for his children. See K.S.A. 38-2269(a), (b)(5). Because the existence of any one of the statutory conditions of unfitness may establish grounds for termination of parental rights if it renders a parent unable to care for the child, we find it unnecessary to address Father's claim of insufficient evidence to support the district court's unfitness findings under K.S.A. 38-2269(b)(7) and (c)(3). See K.S.A. 38-2269(f) ("The existence of any one of the above factors standing alone may, but does not necessarily, establish grounds for termination of parental rights.").

B. *The conduct or condition rendering the parent unable to care properly for a child is unlikely to change in the foreseeable future*

If the court finds clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child, the court next must determine whether the conduct or condition rendering the parent unable to care properly for the child is unlikely to change in the foreseeable future. K.S.A. 38-2269(a). Courts examine the "foreseeable future" from the child's perspective because children and adults have different perceptions of time; a month or a year can seem considerably longer for a child than for an adult. Children have a right to permanency within a timeframe reasonable to them. See K.S.A. 38-2201(b)(4) (expressing policy that provisions of the code be construed with awareness that "time perception of a child differs from that of an adult and to dispose of all proceedings . . . without unnecessary delay"). Further, "'[a] court may look to a parent's past conduct as an indicator of future behavior' and give weight to actions over intentions. [Citations omitted.]" *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024).

16

In assessing whether the conduct or condition rendering the parent unable to care properly for the child is unlikely to change in the foreseeable future, the inquiry does not end merely because the underlying condition—such as incarceration—has a defined endpoint. The statutory framework does not treat a parent's release from incarceration as the definitive point at which their ability to provide proper care is restored. Likewise, the statute does not presume that a parent's inability to care properly for their child ceases the moment a parent stops physically, emotionally, or sexually abusing a child under K.S.A. 38-2269(b)(2) or stops using intoxicating liquors or narcotic or dangerous drugs under K.S.A. 38-2269(b)(3). Rather, K.S.A. 38-2269(a) directs courts to make a forward-looking assessment of whether the parent will be able to care properly for the child in the near term, considering all relevant circumstances. For purposes of imprisonment, this includes not only the projected release date, but also the time and resources required for the parent to secure housing, employment, treatment, and rebuild the parent-child relationship.

The plain language of the statute supports our conclusion. K.S.A. 38-2269(b)(5), which allows the court to consider the "conviction of a felony and imprisonment," does not limit the analysis to the term of incarceration alone. Instead, it authorizes consideration of incarceration as part of a broader inquiry into whether the parent's condition renders them unfit and whether that condition is likely to improve quickly enough to meet the child's need for stability within a time frame reasonable to the child. Thus, the critical question under Kansas law is not just whether the parent will be physically available, but whether the parent will be able to properly care for the child in a time frame consistent with the child's best interests.

In its foreseeability finding, the district court considered Father's criminal history, how well he engaged with the reintegration plan while incarcerated, and his postrelease plans. The court noted Father's history of violent criminal activity resulted in two periods

17

of imprisonment for multiple years and the lack of evidence that he was "doing well" while "out and in the community" in the interim. The court also observed that Father's postrelease plan to live with his mother was a future obstacle to reintegration because she was part of the reason the children were placed into DCF custody initially.

Considering the children (1) had been in State custody for approximately 16 months at the time of the termination hearing, (2) would stay in State custody potentially for another 17 months based on Father's projected release date, and (3) would likely remain in State custody until the State—at some unforeseeable time in the future—could no longer prove by clear and convincing evidence that Father's felony conviction and imprisonment rendered him unable to care properly for his children, the panel agreed with the district court that Father's felony conviction and imprisonment rendering him unable to care properly for his children was unlikely to change in the foreseeable future:

> "The district court did not err by looking at Father's past conduct as an indicator of his future behavior. See *In re M.S.*, 56 Kan. App. 2d at 1264. He committed similar violent felonies in the past. Twelve months is a long time in child time. But even after Father completes his sentence, he would still need to complete the case plan tasks he was unable to complete in prison including finding and maintaining a stable home, finding and maintaining stable employment, maintaining a consistent visitation schedule with the children, attending a parenting class, getting a mental health assessment, and keeping his legal issues resolved. The time frame for Father's reintegration with the children was not foreseeable." *In re K.D.*, 2024 WL 4314687, at *4.

The panel's analysis is sound, and Father does not dispute it or the district court's basis for the foreseeability finding. Rather, he points to language from the Court of Appeals in a different case expressing circumstances that *would not* support a foreseeability finding and are not applicable here: when "the parent already had a well-established relationship with an older child" and the parent's "period of incarceration"

18

was "comparatively short." (Citing *In re K.O.*, No. 116,704, 2017 WL 2403304, at *4 [Kan. App. 2017] [unpublished opinion].) ("In that circumstance, the condition of unfitness—the parent's incarceration—reasonably could be viewed as likely to change in the foreseeable future.").

But, again, those are not the facts here. Father was imprisoned when the children were about two and three years old. Based on his projected date of release, he would have been absent due to his imprisonment for more than half the children's lives up to that point. Nothing in the record suggests the children were being properly cared for prior to Father's imprisonment; indeed, the record reflects DCF's concerns about their safety and welfare at that time. And as the panel pointed out, Father still had more than a year left on his sentence and, even then, would be unable to reintegrate with the children until the State—at some unforeseeable time in the future—could no longer prove by clear and convincing evidence that his felony conviction and imprisonment rendered him unable to care properly for his children.

Having reviewed the record and viewing the evidence in the light most favorable to the State, we conclude a rational fact-finder would find it highly probable, based on clear and convincing evidence, that Father's unfitness was unlikely to change in the foreseeable future.

2. *Best interests of the children*

Lastly, Father challenges the panel's decision to affirm the district court's finding that termination of his parental rights was in the children's best interests. He claims the court did not address the relationship and bond between him and his children or the potential negative effects of termination on the children. He also argues the court's finding regarding the children's behavioral issues relates to the foster placement, not to

him.

Once the district court finds clear and convincing evidence that a parent is unfit by reason of conduct or condition rendering the parent unable to care properly for a child and the inability to do so is unlikely to change in the foreseeable future, the court must decide whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(g)(1). "In making the determination, the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 38-2269(g)(1).

Given the discretion inherent in this determination, Kansas appellate courts have generally reviewed a district court's termination decision for an abuse of discretion. See K.S.A. 38-2269(a) (providing a court *may* terminate a parent's rights after a sufficient finding of unfitness that is unlikely to change in the foreseeable future). At this final stage, the issue is not whether the parent's rights *can* be terminated, the issue is whether—based on the child's needs—the parent's rights *should* be terminated. See *Santosky*, 455 U.S. at 760-61 (expressing that after moving beyond the fact-finding stage to the dispositional stage, the interests of the parent and child diverge which lessens the burden of proof required); *In re R.S.*, 50 Kan. App. 2d 1105, 1113-15, 336 P.3d 903 (2014) (specific factual findings not required for a "best-interests" determination). Under this well-known standard, a district court abuses its discretion if its decision is "arbitrary, fanciful, or unreasonable," or based on an error of fact or law. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022).

The panel applied this standard of review and also expressed that factual findings underlying the best-interests determination are reviewed for a preponderance of evidence. See *In re K.D.*, 2024 WL 4314687, at *5 ("While the district court's unfitness finding

20

must be supported by clear and convincing evidence, the best-interests determination is made on a preponderance of the evidence."). Yet this court recently noted in *In re D.G.* that we have not formally adopted this lower standard of review. We did not resolve that question because the district court had expressly found the relevant findings *were* supported by clear and convincing evidence in that case. 319 Kan. at 462-63.

The same occurred here—the district court framed its best interest factual findings in terms of the clear and convincing evidence standard:

> "The best interest analysis is the same for the children, that they have had behavior issues from not seeing either parent. That they clearly miss—they spoke specifically of their mother, but I believe that that also includes their father, that they have a relationship with him, they miss him. They've had behaviors after they were removed from one foster home to another and that they have—they are deserving of permanency. That they have a potential permanency option with a relative which would leave all three of them together.
>
> "And so the Court does make the best interest finding by clear and convincing evidence. And with that, then, does terminate the parental rights of [Father]."

Reviewing these findings and the ultimate legal conclusion, the panel concluded the district court did not abuse its discretion in terminating Father's parental rights:

> "The district court did not make a factual or legal error. A reasonable person could agree with the district court that permanency was in the children's best interests. The children were struggling after being moved between foster families. Father testified that he had a bond with the children. But he had no contact with his children since April 2022. There was no indication there was a plan for that to change while Father was incarcerated. The children were young and will have spent more time without Father than with him. The district court was in the best place to judge the best interests of these children." *In re K.D.*, 2024 WL 4314687, at *5.

21

But Father contends that the district court and the panel ignored his relationship with the children and failed to consider the negative impact of termination on the children. He further points out that the behavioral issues described relate to the children transitioning between foster homes and "not in anything done by father."

Father's arguments are unpersuasive. First, the transcript of the court's termination decision directly disputes his claim that the court ignored the bond between the children and Father. The court explicitly recognized this relationship and even made an inference in Father's favor that—although the children had only spoken of missing their mother— they must miss him too.

Next, the statute requires the court to "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g)(1). While the court's analysis on this point is not robust, the court both considered that the children miss their parents and that they have struggled behaviorally in foster care, particularly in having to move between placements.

Finally, the statute does not require the district court to perform the type of balancing test that Father suggests should be conducted. Though the court could have considered the potential negative impact of termination on the children versus the potential negative impact of waiting at least another year for Father to be released from prison to attempt reintegration, the statute does not require this. Some weighing of potential outcomes seems inherent in the preceding foreseeability analysis and ultimate permanency determination, but the court did not explicitly weigh those factors in its final ruling. Rather, the court recognized that permanency with a relative is possible and that this would be in the children's best interests, which is all that the statute requires. Evidence in the record supports the court's conclusion.

At the start of this case, K.D. and E.D. presented with some developmental and behavioral issues. In response, the agencies referred the children for appropriate mental health services and required the foster parents to follow a parenting plan to address these issues. K.D.'s issues specifically were severe enough to allow him to qualify for special education services and a state disability waiver, whereas E.D.'s developmental delays seemed to be resolving in foster care. Both children's behaviors were challenging for the foster placements and at school/daycare at various times and required consistent interventions. In July 2022, the children transitioned to a second foster home after being removed from the first due to significant behavioral issues. A reasonable inference is that some of these problems stem from the children's environment and experiences prior to their removal by DCF and were only being identified and addressed in foster care, in the community, and at school because of the State's involvement.

Importantly, these issues directly affected the children's stability in foster care; instability was an impetus for the children's removal from the first placement. And just before the termination hearing in December 2022, the second foster placement filed a "disruption notice" for K.D. and E.D., alerting the relevant agencies that they had submitted a pending request to have the children removed from their home. Although the second set of foster parents appear not to have moved forward with the transfer at that time, the urgency for permanency was real at the time of the termination hearing.

Finally, the record also supports the district court's conclusion that termination of parental rights was in the best interests of the children given the potential permanency option available to the children of going to live with their maternal grandmother in Virginia. According to the CASA worker and substantiated by other documentation in the record, the maternal grandmother was proactive and engaged throughout the ICPC process. She often contacted Cornerstones of Care and CASA to check on the status. She also made requisite adjustments, based on DCF feedback, so that she could be approved.

She had virtual visits with the children and planned a week-long vacation in March 2023 (after the termination hearing) to spend time with them during their spring break. Since the start of this case in June 2021, the maternal grandmother was the children's primary contact with an adult family member.

CONCLUSION

In sum, the evidence supports the district court's conclusion that the children's physical, mental, and emotional health would best be served by terminating parental rights and providing permanency with their maternal grandmother. Thus, the panel did not err in affirming the district court's decision that termination of Father's parental rights was in the children's best interests.

Affirmed.

WILSON, J., not participating.

\* \* \*

STEGALL, J., dissenting: The majority holds that Father's parental rights can and should be terminated under K.S.A. 38-2269(b)(5) because the record before the district court contained clear and convincing evidence that Father's imprisonment for a felony conviction would continue to render him unable to care properly for his children *even after he was released*. *In re K.D. and E.D.*, 321 Kan. ___, ___, slip op. at 15-17 (2025). Unfortunately, this is a brand-new court-made standard for incarcerated parents that doesn't exist in Kansas statute and jeopardizes incarcerated parents' core and cherished constitutional rights—the right to parent their children. *Wisconsin v. Yoder*, 406 U.S. 205, 232, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972) ("The history and culture of Western

24

civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."). See also *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018) ("Natural parents who have assumed parental responsibilities have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution.").

The statutory standard for constitutionally terminating a parent's right to parent is clear. It requires two steps: first, a finding of unfitness. K.S.A. 38-2269(a). Then, a finding that termination is in the best interests of the child. K.S.A. 38-2269(g)(1). A court cannot proceed to a "best interests" analysis until the parent is first properly deemed unfit. And the unfitness finding itself requires two steps:

> "[T]he court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child *and the conduct or condition is unlikely to change in the foreseeable future*." (Emphasis added.) K.S.A. 38-2269(a).

Thus, unfitness cannot be found unless there exists (1) conduct or a condition in the present which renders the parent unable to care properly for the child; and (2) a finding that the conduct or condition is unlikely to change in the foreseeable future. Each prong must be found by clear and convincing evidence. Incarceration for a felony is one "condition" enumerated in the statute that can render a parent unable to care properly for a child. K.S.A. 38-2269(b)(5).

In this case, the district court identified three conditions existing in December of 2022 hindering Father's ability to care properly for his children—and found that those conditions were unlikely to change in the foreseeable future. One of these conditions was

25

incarceration. The Court of Appeals affirmed on the grounds of incarceration only. *In re K.D. and E.D.*, No. 126,718, 2024 WL 4314687, at \*3-5 (Kan. App. 2024) (unpublished opinion). Thus, on review, we are left only with a finding that Father was incarcerated and that this present condition (as of December 2022) was "unlikely to change in the foreseeable future."

Framing this appeal in the clear language of the statute delivers an obvious and unavoidable outcome—Father's parental rights could not be terminated in December of 2022 on the grounds of incarceration because the record is clear that the end of Father's incarceration was not merely foreseeable, it was known with certainty. He was to be released in April 2024 *at the latest*. With good-time credit, Father could have been released as early as December 2023 (and in fact he was). At the time of the district court's order Father had, at most, 16 months left of his sentence. Even from a child's point of view, this period of time is certainly *foreseeable*. See *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024) ("'The foreseeable future is examined from the perspective of a child because children and adults have different perceptions of time and children have a right to permanency within a time frame reasonable to them.'").

The majority certainly understands that the end of Father's incarceration—the only condition of unfitness properly found by the district court and before us on appeal—was foreseeable because it goes to great lengths to *extend* the period of "unfit" time beyond what the statute permits. The majority states that the foreseeability inquiry "does not end merely because the underlying condition—such as incarceration—has a defined endpoint." *In re K.D. and E.D.*, 321 Kan. at ___, slip op. at 17. But isn't that exactly what the words of the statute do in fact command? If the "condition"—here, incarceration—is "likely" to "change" in the "foreseeable future" the inquiry is over. See K.S.A. 38-2269(a). There is nothing else for a court to do but to refuse to terminate parental rights or to find some alternative conduct or condition on which to base a finding of unfitness.

26

But the majority is not content to simply follow the clear command of the statute. Instead, according to the majority, the "critical question under Kansas law is not just whether the parent will be physically available, but whether the parent will be able to properly care for the child in a time frame consistent with the child's best interests." 321 Kan. at ___, slip op. at 17. The majority thus finds authorization to include "not only the projected release date, but also the time and resources required for the parent to secure housing, employment, treatment, and rebuild the parent-child relationship" in determining unfitness due to felony incarceration. 321 Kan. at ___, slip op. at 17.

This amounts to a stunning expansion of the state's power to terminate parental rights, especially in the case of incarcerated parents, but not exclusively so. In direct contradiction with K.S.A. 38-2269(a), this court now says that parents who are unable to care properly for a child by virtue of a presently existing condition must not only remedy that condition within a foreseeable timeframe, but they must *also* prove that they can meet this court's ambiguous and subjective threshold for being a "good parent" including "housing," "employment," "treatment," and most speculative of all—"rebuild[ing] the parent-child relationship." 321 Kan. at ___, slip op. at 17. And they must do all of this within a time-frame foreseeable to the child even *after* the originally found condition rendering the parent unable to care properly for the child no longer exists.

In effect, this means that a parent with a presently existing condition of unfitness is bound not merely to remedy *that* condition, but to satisfy a reviewing court that unknown and speculative future conditions of unfitness will *also* not be present. This puts already struggling parents into what amounts to an impossible whack-a-mole dilemma. And we know that when parent termination law moves too far into subjective and ill-defined goals the "evidence" a judge will accept and credit to "support a vague legal standard" will be "entirely dependent on the particular judge's subjective biases, personal life

27

experiences, norm and taboo matrices, and socio-economic expectations." *In re F.C.*, 313 Kan. 31, 46, 482 P.3d 1137 (2021) (Stegall, J., dissenting). None of this is authorized by Kansas law, and all of it will work substantial prejudice against the parental rights of the most disadvantaged among us—notably minority and poor fathers.

In a survey of child welfare cases from 2006 to 2016, approximately one in eight incarcerated parents lost their parental rights, regardless of the seriousness of their offenses. Hager & Flagg, *How Incarcerated Parents Are Losing Their Children Forever*, The Marshall Project (Dec. 2, 2018). Most incarcerated persons are men and the majority of those men are fathers to minor children. Maldonado, *Recidivism and Paternal Engagement*, 40 Fam. L. Q. 191, 192 (2006). And while courts may be amenable to downward departures when sentencing women who are primary caretakers of their children, such departures are frequently rejected when fathers are the primary caregivers. Jones, *Neglected by the System:  A Call for Equal Treatment for Incarcerated Fathers and Their Children—Will Father Absenteeism Perpetuate the Cycle of Criminality?*, 39 Cal. W. L. Rev. 87, 105-07 (2002) (illustrating examples).

But the majority's holding won't just hurt incarcerated fathers—it will hurt incarcerated mothers as well. While the majority of incarcerated persons are men, the number of incarcerated women has been increasing at double the rate for men in recent decades. Budd, *Incarcerated Women and Girls*, The Sentencing Project (July 24, 2024). "Incarcerated women are disproportionately minorities and of low socioeconomic status." Wynn, *Mean Women and Misplaced Priorities:  Incarcerated Women in Oklahoma*, 27 Wis. J.L. Gender & Soc'y 281, 285 (2012). Like incarcerated men, most incarcerated women have minor children. Sawyer, *The Gender Divide:  Tracking Women's State Prison Growth*, Prison Policy Initiative (Jan. 9, 2018). But the incarceration of mothers frequently creates problems because many of these women are the primary caregiver for

their children. McConnell, *The War on Women:  The Collateral Consequences of Female Incarceration*, 21 Lewis & Clark L. Rev. 493, 509-10 (2017).

Poor and minority families are already overrepresented in the child welfare system. Hean, *The Worst Collateral Consequence:  Rethinking the Best Interests Standard in the Context of Racism, Classism, and Mass Incarceration*, 45 Child. Legal Rts. J. 1, 7 (2024). And "[w]hen incarceration leads to the termination of parental rights, the racial and socioeconomic disparities of the criminal legal system are compounded by these same disparities in the child welfare system." 45 Child. Legal Rts. J. at 7.

The societal problem of incarcerated parents is monumental and tackling that problem in all its complexities is far beyond the scope of this opinion. It will suffice here to remark that incarcerated parents—who are disproportionately minorities and socioeconomically disadvantaged—already face steep challenges when it comes to maintaining and fostering the parent-child relationship. We as a court do not need to make those challenges any steeper than they already are. And yet we have.

I am reminded that

"the reality of subjective judicial decisions driven by the biases of judges is a perennial problem in this area of the law. And that bias is nearly always exercised on behalf of the upwardly mobile, middle-class, bourgeois, and polite society from which the majority of judges come, and in which most judges continue to live." *In re F.C.*, 313 Kan. at 49-50 (Stegall, J., dissenting).

The proper check against this natural tendency is to rigorously adhere to the objective rules of parental termination as set forth in our statutes. When we fail to do that—as here—we open the door for unintentional systemic prejudices (against incarcerated fathers, for example) to overwhelm what ought to be a fastidious respect for the

constitutional rights of all our citizens—and the related veneration for the natural relationship between parents and children, no matter what their life circumstances may be. That relationship is not to be severed casually or without great care.

WALL, J., joins the foregoing dissenting opinion.